IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

KERRI MARIE LEBLANC,
     Plaintiff,

vs.                            Case No.: 3:18cv1336/EMT

ANDREW SAUL,
Commissioner of Social Security,[1]
     Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* ECF Nos. 3, 4). It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019. Pursuant to Fed. R. Civ. P. 25(d), he is therefore automatically substituted for Nancy A. Berryhill as the Defendant in this case.

I.     PROCEDURAL HISTORY

On January 30, 2015, Plaintiff filed her application for DIB, and in the application she alleged disability beginning January 1, 2011 (tr. 15).[2] Her application was denied initially and on reconsideration, and thereafter she requested a hearing before an administrative law judge ("ALJ").   A hearing was held on February 22, 2017, and on June 5, 2017, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined under the Act, at any time through the date of his decision (tr. 15–30).   The Appeals Council subsequently denied Plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.   Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).   This appeal followed.

II.    FINDINGS OF THE ALJ

In denying Plaintiff's claims, the ALJ made the following relevant findings (see tr. 15–30):

---

[2] All references to "tr." refer to the transcript of the Social Security Administration's record filed on July 18, 2018 (ECF No. 6).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

Case No.: 3:18cv1336/EMT

(1)     Plaintiff last met the insured status requirements of the Act on March 31, 2015[3];

(2)     Plaintiff did not engage in substantial gainful activity during the relevant period;

(3)     Plaintiff had the following severe impairments: post-traumatic stress disorder ("PTSD"), depression, and anxiety;

(4)     Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(5)     Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, with certain non-exertional limitations;

(6)     Plaintiff was unable to perform her past relevant work because that work would have exceeded her RFC, but she could have performed other available work which accommodated her RFC and other factors;

(7)     Plaintiff was 55 years old, which is defined as an individual of advanced age, on the date last insured;

(8)     Plaintiff has at least a high school education and is able to communicate in English;

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not she has transferable job skills;

(10)     Jobs existed in significant numbers in the national economy that Plaintiff could have performed during the relevant period; therefore, Plaintiff was not under a disability, as defined in the Act, at any time during the relevant period.

---

[3] Thus, the time frame relevant to Plaintiff's claim for DIB is just over four years, from January 1, 2011 (date of alleged onset), through March 31, 2015 (date last insured).

Case No.: 3:18cv1336/EMT

## III.   STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); see also Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), superseded by statute on other grounds as stated in Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S.

389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A). Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then

prove she cannot perform the work suggested by the Commissioner. <u>Hale v. Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

A.    Relevant Personal and Employment History

Plaintiff was fifty-seven years of age on February 22, 2017, the date of her hearing before the ALJ (tr. 40). She had completed the twelfth grade and some college and received a "certificate in medical billing and coding" and in health services management (tr. 41). Plaintiff was living alone in an apartment, had a driver's license, and was able to drive (tr. 40).

Plaintiff last worked as a full-time caregiver for her parents, from 2011 until her mother moved to an assisted-living facility on August 1, 2013 (tr. 42, 61). Plaintiff noted she had not looked or applied for work since January 2011 (tr. 41). Plaintiff held other prior jobs, including: (1) "recovery clerk" at a discount store in 2010, fifteen hours a week, where she replaced items on shelves (tr. 45, 217); (2) counter clerk at a drycleaner in 2010, forty hours per week, where she ran the cash register, kept the store in order, tallied the register, and closed the store (tr. 45–46, 217); (3) proofreader and editor from 1991 to 2009, forty hours per week(tr. 43–44, 217); and (4) student assistant between 2006 and 2007, where she answered phones, made

appointments, proctored tests, developed inventory lists, and organized equipment (tr. 44).

### B. Relevant Medical History[4]

### (1) Evidence that Pre-Dates the Relevant Period (< January 2011)

Plaintiff sought treatment at Catholic Charities in June 2000, and complained of feeling anxious, sad, lonely, and fearful (tr. 307). She was described as presenting with PTSD[5] and panic disorder without agoraphobia (*id.*). Plaintiff participated in eighty-four cognitive-behavioral therapy ("CBT") sessions (*id.*). The provider assessed Plaintiff's Global Assessment of Functioning ("GAF") at 50 at the start of treatment, and at 59 at the end of treatment (*id.*).[6] Plaintiff's treatment was terminated in 2002 due to lack of contact from her (tr. 308).

### (2) Evidence from the Relevant Period (January 1, 2011, to March 31, 2015)

---

[4] Because the issues in this appeal relate to Plaintiff's mental impairments only, the court's summary of the medical evidence will primarily focus on the same.

[5] Plaintiff explained she was first diagnosed with PTSD in 1995 by her general physician, based on having exaggerated responses when people walked up behind her (*see* tr. 337).

[6] Global assessment of functioning is the overall level at which an individual functions, including social, occupational, academic, and other areas of personal performance. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994). It may be expressed as a numerical score. *Id.* at 32. A GAF score between 41 and 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score between 51 and 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

Susan Danahy, Ph.D., conducted a consultative disability evaluation on July 25, 2011(tr. 311–14). Dr. Danahy described Plaintiff as "extremely tense, anxious and overly reactive" but fully oriented, with a fully intact memory and no evidence of a thought disorder (tr. 312). Plaintiff's ability to form rapport was fair, and her insight and judgment seemed grossly intact (*id.*). Dr. Danahy assessed a GAF score of 48, as well as panic disorder with agoraphobia, generalized anxiety disorder, and depressive disorder with a noted prior diagnosis of PTSD (tr. 314). Dr. Danahy noted Plaintiff had never been evaluated by a psychiatrist and suggested such a referral for medication management, at least with respect to Plaintiff's anxiety (*see id.*).

Plaintiff first reported to Westside Family Medicine - First Physicians on May 21, 2012 (tr. 316). She saw Edwin Taylor, M.D., and complained of anxiety, PTSD, and insomnia (*id.*). Dr. Taylor noted that Plaintiff's medications were "effective and working well for her," that Plaintiff's intellectual functioning and memory were intact, and that Plaintiff was "oriented x3 [i.e., to person, place, and time]" but that she appeared anxious (*id.*). Plaintiff returned on November 21, 2012, and was observed to have a normal mood and appropriate affect (tr. 318). Her medications included Citalopram 10mg, Temazepam 30mg, and Valium 5mg (tr. 317). On May 22, 2013, Dr. Taylor noted that Plaintiff's mood was normal and her affect appropriate; he assessed depressive disorder (tr. 321–22). At Plaintiff's next visit, on November 22,

2013, her chief complaint was anxiety (tr. 323). Dr. Taylor commented, "the anxiety disorder has been essentially unchanged since the last visit and has been "waxing and waning in severity," that Plaintiff's "mood has been improving with medication," and that a mental status examination revealed Plaintiff to be oriented x3, with intact memory and intact immediate and long-term recall (323–24). Plaintiff returned for six-month follow-up appointments in May and November 2014 (tr. 326–30). She was again found to be oriented x3, with intact memory and intact immediate and long-term recall (tr. 328). Plaintiff denied symptoms of depression and difficulty sleeping (tr. 329). She was instructed to call or return to the clinic if her symptoms worsened or persisted (tr. 330).

On April 20, 2015, Janice T. Griffin, LCSW, wrote a letter indicating that Plaintiff had "been in individual therapy with [her] for the past 6 months," or since approximately October 2014 (tr. 335). Ms. Griffin opined that Plaintiff was "likely unable to be successful in any occupational setting" due to some of her "severe symptoms" such as "panic, tearfulness, excessive worry and communication issues" (*id.*).

> (3) <u>Evidence that Post-Dates the Relevant Period (> March 2015)</u>
>
> a. <u>Evidence *from Treating Sources*</u>

Plaintiff continued six-month follow-up visits with First Physicians and saw Dr. Taylor in May 2015, and Donald R. Mason, M.D., in November 2015 (tr. 375–78). In May, Dr. Taylor noted Plaintiff to have increasing anxiety "associated with upcoming court date (6/23/15) to address compensation for patient being caretaker for her two parents who have dementia" (tr. 375). Plaintiff reported anxiety, depression, and difficulty sleeping, and Dr. Taylor noted a depressed mood and affect (tr. 375–67). In November, Plaintiff advised that her family and court issues were resolved and she was no longer depressed, though she still reported anxiety and difficulty sleeping (tr. 377). Dr. Mason observed Plaintiff's mood and affect to be normal (tr. 378). He also noted Plaintiff had begun treatment with psychiatrist Henry Dohn, M.D., who had recently adjusted Plaintiff's medications (*see* tr. 377). In both May and November, Plaintiff denied suicidal ideation and was assessed with insomnia, PTSD, anxiety, depression, and/or "underweight" (*see* tr. 375–78).

On June 30, 2015, Plaintiff presented to Dr. Dohn for treatment (*see* tr. 351–52). Plaintiff completed various psychological assessments, including the Zung Anxiety Scale (tr. 352), the OCD Screener (tr. 353), the Mood Disorder Questionnaire (tr. 354), the Modified Wender Utah Rating Scale (tr. 355), and the Audit Self-Report Scale Symptom Checklist (tr. 356). Plaintiff largely reported no or only mild psychological symptoms on each assessment (*see* tr. 352–56). Additionally, Dr. Dohn

conducted a Mini-Mental State Examination ("MMSE") to assess Plaintiff's "cognitive state" (tr. 351). Plaintiff scored twenty-nine on a thirty-point scale, indicating only a mild cognitive impairment (*id.*).[7] Dr. Dohn also assessed a score of "6" on the Patient Health Questionnaire ("PHQ")-9, indicating only a mild level of depression (*see* tr. 358, 398). Last, Dr. Dohn assessed a GAF score of "50/60" and prescribed Paxil, Restoril, and Valium (*see* tr. 385–86).

On July 10, 2015, LCSW Griffin completed a Mental RFC Questionnaire (tr. 360). Ms. Griffin assessed moderate to marked functional limitations and "frequent" deficiencies in concentration, persistence, or pace "resulting in frequent failure to complete tasks in a timely manner (in a work setting or elsewhere)" (tr. 360–61). She also opined that Plaintiff would miss more than three days of work each month (tr. 361). Last, Ms. Griffin opined that Plaintiff's condition had been at this level of severity since 2001 and that her limitations had lasted or would be expected to last for at least twelve months (*id.*).

---

[7] A score of 21 or higher on the MMSE equates to mild cognitive impairment; a score between 10 and 20 indicates moderate impairment; and a score of 9 or below indicates severe impairment (tr. 351). As noted, Plaintiff made nearly a perfect score—and one well above the threshold for even a mild cognitive impairment. Her only deficit was a slight one with respect to recall; she had no deficits in any other area tested, such as orientation, registration/memory, attention and calculation, and language skills, including repetition (*see id.*).

It appears that Plaintiff returned to First Physicians or Dr. Dohn on seven additional occasions, once in October 2015, and six times in 2016, on January 7, March 18, May 19, June 9, October 7, and November 15 (*see* tr. 398, 400–01). In October 2015, Plaintiff stated she was "okay," sleeping well (i.e., getting eight hours of sleep per night), waking up feeling refreshed, and more energetic, though she still reported symptoms of anxiety and depression (tr. 384). Plaintiff's PHQ-9 score was 4, indicating a "minimal" level of depression (tr. 398). The treatment note from January 7, 2016, is similar, including a report by Plaintiff that she was "okay" and sleeping well but had experienced some increased depression over the holidays (tr. 383). Again, her PHQ-9 score was 4 (*id.*). Her medications were adjusted and continued (*id.*). In March 2016, Plaintiff reported "doing better," and Dr. Dohn characterized her as "stable" and reduced her PHQ-9 score to 2 (tr. 396). On May 19, 2016, Plaintiff saw Dr. Mason, who observed Plaintiff's judgment and insight to be intact with a normal mood but anxious affect (tr. 402–03). Plaintiff reported she was "sleeping well" and without difficulty, and her medication was helping; she denied depression and suicidal ideation (*id.*). The court has not located a treatment record for Plaintiff's visit on June 9, 2016, but a PHQ-9 chart documents an increased score of 5 on that date, indicating a mild (instead of "minimal") level of depression (*see* tr. 398). The treatment record from October 2016 is handwritten and difficult to read,

but it does indicate a normal psychiatric assessment/examination (as reflected by "check-off boxes") (tr. 394). It also shows an increased PHQ-9 score of 6 (still a "mild" level of depression (*see* tr. 398)), but due to the illegibility of the treatment record, the reason for the slightly increased score is unclear (*see* tr. 394).[8] Finally, on November 15, 2016, Plaintiff saw Darin L. Dinelli, M.D. (tr. 400–01). Plaintiff advised she was seeing Dr. Dohn and was "very happy with him" (tr. 400). Dr. Dinelli observed that Plaintiff "overall is doing well medically" and had presented with normal affect and mood and responded appropriately to all questions (*id.*).

Plaintiff returned to LCSW Griffin in June and July 2016 (*see* tr. 412). There are no treatment records from these visits, but there is another Mental RFC Questionnaire, completed by Ms. Griffin on July 14, 2017 (tr. 413–14). Ms. Griffin's opinions on this form are essentially the same as those on the questionnaire she previously completed (*see id.*; tr. 360–61).

On January 26, 2017, Dr. Dohn completed a Mental RFC Questionnaire, similar to the ones completed by Ms. Griffin (tr. 410–11). He assessed slight to moderate functional limitations, and he opined that these limitations were present when he first

---

[8] It bears mention that other treatment records of Dr. Dohn have the same "check-off" options and reveal similar assessments. For example, on October 5, 2015, and January 7, 2016, Dr. Dohn indicated that Plaintiff's speech was fluent, and she was alert and clear, attentive, cooperative, pleasant, and logical/goal oriented (but also anxious) (tr. 383–84).

saw Plaintiff on June 30, 2015 (*id.*). Dr. Dohn also opined that Plaintiff's condition would likely produce "good days" and "bad days" and cause her to miss more than three work days each month (tr. 411). Dr. Dohn qualified his opinions by stating, "I have not seen her since 7 Oct[ober] [20]16, so I can't give you any guess about how she is now" (*id.*).

b.     Evidence *from Non-Treating Sources*

On May 20, 2015, Plaintiff was evaluated by John F. Duffy, Ph.D., upon referral by the Division of Disability Determinations (tr. 337–39). Dr. Duffy noted Plaintiff's report that she had been diagnosed with PTSD by her general physician in 1995 "on the basis of having exaggerated responses if people walk up behind her," but he was unable to elicit other symptoms that warranted that diagnosis (tr. 337). He described Plaintiff as "alert, oriented and cooperative" with clear speech and fairly good immediate attention (tr. 338). He assessed panic disorder without agoraphobia, social anxiety disorder, adjustment disorder with mixed depression and anxiety, and personality disorder with schizoid features, as well as a GAF score of 55 (tr. 339). Dr. Duffy noted that, historically, Plaintiff had functioned well in jobs that involved minimal socialization (*id.*).

State agency consultants Lawrence Annis, Ph.D., and George Grubbs, PsyD., assessed Plaintiff's Mental RFC at the initial and reconsideration levels of review on

June 4 and July 22, 2015, respectively (tr. 105–15, 116–27). Each found Plaintiff to have the medically determinable impairments of anxiety, depression, and PTSD—affective disorders or anxiety-related disorders under Listing 12.04 or 12.06 (tr. 109, 121)—although Dr. Grubbs additionally considered Plaintiff's alleged "phobias" (*see, e.g.*, tr. 121). Each found no restrictions in activities of daily living; moderate difficulties in maintaining social functioning; no episodes of decomposition; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation (*id.*). Dr. Annis and Dr. Grubbs both determined that Plaintiff's impairments did not meet the criteria of the listings, and she was not disabled because she was able to perform work (*id.*).

> C.     Testimony at Hearing before ALJ on February 22, 2017, and
>        Other Relevant Statements

> (1)     Testimony and Statements of Plaintiff

Plaintiff testified she was taking Paxil and Diazepam and the medications were helping, but she still occasionally had panic attacks when she felt insecure, upset, or unsafe, noting the attacks could happen anywhere but crowds were a specific trigger (tr. 49–51, 56). Her panic attacks lasted thirty to forty-five minutes and caused her to be "paralyzed" and unable to move (tr. 49–52). She reported no problems with her memory or with following simple instructions, shopping alone, handling her finances,

or getting along with others but occasional problems maintaining attention and making decisions (tr. 54–55, 64). Her daily activities included watching television, using the internet, running errands, and reading (tr. 58–59).

Plaintiff began caring for her parents, full-time, in January 2011 (tr. 41). Her duties included preparing meals, taking her parents to appointments, and doing "everyday normal stuff [such as] making sure [her parents] were clean," ensuring the house was in good order, ordering and managing her parents' medications, and handling her parents' finances (tr. 42, 57). Plaintiff's father passed away in late August 2011, and Plaintiff continued caring for her mother until her mother moved into an assisted living facility in August 2013 (tr. 42, 57, 61). In 2014 Plaintiff became a guardian for her mother, and although she remained responsible for her mother's finances, she then became regulated by a court and was required to report her mother's financial affairs to the court (tr. 57–58).

Plaintiff completed a Function Report on April 14, 2015. She claimed her anxiety caused her trouble "engaging with others" and "concentrating enough to work productively" and affected her sleep and appetite (tr. 250–53). She reported no problems remembering to take her medication, preparing meals, or handling her financial matters (*id*.). She enjoyed reading, watching TV, doing yoga, and researching matters of interest to her (tr. 254). She was able to pay attention

"throughout a conversation, the length of a TV show or movie"; she did "well" with written instructions and spoken instructions; and she got along " well" with authority figures but was "fearful" (tr. 255–56). Plaintiff reported she did not handle stress or changes in routine well (tr. 256). She had "many phobias, i.e., traffic, driving at night, crowds, etc." and had panic attacks (*id.*). Last, she noted her medications caused no side effects (tr. 257).

Plaintiff also completed a Supplemental Anxiety Questionnaire on April 14, 2015 (tr. 261–63). She reported anxiety attacks since the age of four, that her last attack was on April 12, 2015, that she had attacks "anywhere from two a week to every day," and that each attack lasted "from ten to twenty minutes" (tr. 262). She claimed that the attacks were caused and worsened by "crowds, loudness, outside stress, siblings, traffic, driving including at night" and meeting new people (*id.*). She claimed that when she had a panic attack her extremities went numb, and she became fearful, had difficulty thinking clearly, and was unable to breathe or "function in general" (tr. 262–63). Her panic attack symptoms were relieved by being in her home "where it is quiet" and with Valium (tr. 262).

(2)     Testimony and Statements of Edmond Holt

Mr. Holt is an attorney who represented Plaintiff in the guardianship case involving her mother (tr. 67). He first met Plaintiff in September 2011, and his

impression of her was that she was "an absolute shell of a person" and extremely withdrawn (tr. 71). Plaintiff became Mr. Holt's primary client around October 2012 when her mother's condition worsened (tr. 72). He took particular interest in Plaintiff because she was "just absolutely overwhelmed" by her mother's demands, demeanor, and belittlement, and she struggled to make decisions (tr. 75). He explained his staff performed extra work to assist her—more than their average client—and did not bill her for certain things such as helping her make decisions and cleaning her mother's house before it sold (*id.*).

At the time of Plaintiff's hearing Mr. Holt was representing Plaintiff in an effort to obtain compensation for her guardianship role (tr. 67). Mr. Holt informed the ALJ that Plaintiff's guardianship commenced in 2014 and had continued through the date of the hearing, despite her mother's passing in 2016, and he was requesting compensation for Plaintiff in the amount of $19,000 (*id.*). Mr. Holt explained that Plaintiff's care for her parent(s), which commenced in early 2011, was a full-time, "24/7 kind of position," such that she could not obtain gainful employment, and he noted she was being supported by her parents at that time (tr. 69, 72). Mr. Holt added that Plaintiff retained "full plenary guardianship of her [mother's] person and property" and still made her mother's medical decisions after her mother moved into a full-time care facility in July 2013 (tr. 70–71). He clarified he was only seeking

compensation for the guardianship role, given that Plaintiff was previously supported by her parent(s) (tr. 69–70, 79–80).

Mr. Holt then offered his opinions as to Plaintiff's ability to work based on his interactions with her (tr. 76–79). He stated, Plaintiff "can't do things that an ordinary person would be expected to do on their own" and likely could not work due to significant anxieties, fears, an inability to follow directions, and indecisiveness (tr. 77–78). He stated he had witnessed Plaintiff "go into a full-blown panic attack" and described it as "disconcerting" (tr. 77). He noted he had referred Plaintiff to LCSW Griffin (tr. 88). Mr. Holt opined that Plaintiff "could not have served as the guardian and be[en] able to do for her mom what she needed to [do] without our help" (tr. 79). He also generally testified that he did not believe Plaintiff could perform any level of work (tr. 76–77). This testimony prompted the ALJ to ask Mr. Holt how he could reconcile Plaintiff's full-time care for her parents (including management of her mother's medications, finances, and household, and the performance of other "detailed and complex" tasks) *and* later becoming her mother's guardian, while at the same time testifying that Plaintiff:

> would be unable to do simple and unskilled repetitive type work that involves very little thought. I just don't understand. I can't justify that in my mind how we can have representations to a court as to ["]we should appoint [Plaintiff] to take care of . . . [her mother"] . . . while at the same time telling me that she can't handle . . . the easiest of work . . . an unskilled job. I'm having trouble rectifying that in my mind.

(tr. 83). Mr. Holt provided an answer that did not allay the ALJ's concerns (tr. 84).

So the ALJ asked the same basic question in a different way:

> So you think it's reasonable then that to appoint somebody over a person to take care of their finances and at the same time think that they can't do any type of work in the national economy even if it's a simple, routine, repetitive thing and you're doing the same thing over and over again?

(*id.*). Again, Attorney Holt seemingly failed to rectify the concern the ALJ had with his testimony (*see* tr. 85–87).[9] Plaintiff's counsel ultimately offered an explanation, stating that Mr. Holt did not mean Plaintiff was incapable of doing anything, but instead that he did not believe she could perform "competitive" employment (tr. 87).

Mr. Holt also completed third-party questionnaires/forms in April 2015 (tr. 223–35, 264–66). In sum, Mr. Holt reported no difficulties with Plaintiff's ability to prepare meals; drive; shop; take care of herself, her household, and her finances; or (previously) assist her mother with her bills and other personal affairs, although he noted in several areas that he "[did] not know" the answer and thus could not respond to various questions (*id.*). Mr. Holt opined that Plaintiff's social activities were restricted due to anxiety (tr. 234), that she sometimes had trouble completing tasks on time (tr. 228), and that her ability to maintain gainful employment was "impossible"

---

[9] Holt acknowledged that certified professional guardians were available as options in the Pensacola area where Plaintiff and her parents lived at the time she cared for them and served as her mother's guardian (*see* tr. 93).

due to her difficulty interacting with people (tr. 230; *see also* tr. 235 (same general opinion)).

### (3)    Testimony of Vocational Expert James Miller

Vocational expert ("VE") Miller classified Plaintiff's past work as a proofreader as light, skilled work; as an appointment clerk as sedentary, semiskilled work; as a home health aid as medium, semiskilled work; and as a laundry counter attendant, returns clerk, and general office clerk as light, semiskilled work (tr. 96–97).  VE Miller then testified that a hypothetical person with Plaintiff's RFC could not perform her past relevant work (tr. 98).  The person could, however, perform other available work in the national economy such as cleaner/housekeeper (light, unskilled); hand packager or laundry worker (medium, unskilled); and kitchen helper (medium (skill level not provided, but SVP of 2 noted)), the latter of which the VE described as "generally consistent with the hypothetical" and otherwise consistent with Plaintiff's RFC (*see id.*).  The VE opined, however, that if the same hypothetical individual missed more than two days of work per month she would not be able to maintain employment (tr. 99).  Similarly, if that same hypothetical individual could not interact with supervisors, there would be no work in the national economy she could perform (*id.*).

## V.    DISCUSSION

Plaintiff seeks reversal of the Commissioner's final decision and a "full award" of DIB, contending that: (1) the ALJ erred in failing to give proper weight to various medical opinions of record, including those of Dr. Dohn, Dr. Danahy, LCSW Griffin, and the non-examining agency psychologists; and (2) the ALJ erred in failing to give significant weight to the opinions of Attorney Holt (*see* ECF No. 12 at 16, 19, 28).

A.     Opinions of Dr. Dohn, Dr. Danahy, LCSW Griffin, and Drs. Duffy and Annis

In Social Security cases, the opinions of a treating physician are entitled to more weight than those of consulting or evaluating health professionals. Schink v. Comm'r of Soc. Sec., No. 17-14992, 2019 WL 4023639, at *7 (11th Cir. Aug. 27, 2019). "This is because treating physicians are more likely to be able to give a more complete picture of the applicant's health history." Id. As set forth by the Social Security Administration, treating physicians

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2).

The ALJ must give a treating physician's opinion "substantial or considerable weight unless good cause is shown to the contrary." Phillips v. Barnhart, 357 F.3d

1232, 1240 (11th Cir. 2004) (citation omitted); *see also* 20 C.F.R. § 404.1527(c)(2).[10]

Good cause exists when (1) the treating physician's opinion was not bolstered by the evidence, (2) the evidence supported a contrary finding, or (3) the treating physician's opinion was conclusory or inconsistent with his or her own medical records. Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011); Phillips, 357 F.3d at 1240–41. An ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician. Winschel, 631 F.3d at 1179; *see also* 20 C.F.R. § 404.1527(c)(2) (noting that "good reasons" must be provided in the decision for the weight given to treating source's medical opinion). The failure to do so is reversible error. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

An ALJ must consider many factors when weighing a medical opinion, including, for example: (1) the examining relationship (more weight is given to the medical opinion of a source who examined the claimant than one who did not); (2) the treatment relationship, including the length and nature of the treatment relationship; (3) whether the medical opinion is amply supported by relevant evidence; (4) whether

---

[10] This regulation applies to claims filed before March 27, 2017. *See* 20 C.F.R. § 404.1527. Claims filed on or after that date are governed by a new regulation prescribing somewhat different standards for the handling of opinions from treating physicians. *See id.* § 404.1520c. Because Plaintiff's claim was filed in January 2015, this court need not and does not consider how the new regulation would interact with Eleventh Circuit precedent requiring the ALJ to give a treating physician's opinion substantial or considerable weight absent an articulation of good cause to do otherwise.

an opinion is consistent with the record as a whole; and (5) the doctor's specialization. *See* 20 C.F.R. § 404.1527(c); <u>Schink</u>, 2019 WL 4023639, at *8 n.5.    Finally, non-examining physicians' opinions are entitled to little weight when they contradict opinions of examining physicians and do not alone constitute substantial evidence. <u>Sharfarz v. Bowen</u>, 825 F.2d 278, 280 (11th Cir. 1987) (per curiam).

(1)    Henry Dohn, M.D., Treating Physician

Although Dr. Dohn is a specialist and a treating physician, he did not see Plaintiff until shortly after the relevant period.    Nevertheless, because he is the only treating specialist of record, and evidence from the relevant period is sparse, the ALJ concluded Dr. Dohn's records and opinions were relevant and considered them in making his overall findings.    Plaintiff does not fault the ALJ for doing so.    Instead, Plaintiff asserts error only as to one aspect of the ALJ's findings regarding Dr. Dohn (*see* ECF No. 12 at 23–24).

As noted above, Dr. Dohn completed a questionnaire in January 2017.    In pertinent part, Dr. Dohn assessed "moderate" limitations in the following three functional areas: (1) concentration, persistence, or pace; (2) episodes of deterioration or decompensation in work or work-like settings; and (3) understanding, remembering, and carrying out instructions (tr. 410).    Dr. Dohn also opined that Plaintiff would miss more than three days of work per month (tr. 411).    The ALJ

assigned "great weight" to all of the opinions on this questionnaire, except the opinion that Plaintiff would miss more than three days of work per month (tr. 26). Plaintiff claims the ALJ erred by adopting the moderate functional limitations assessed by Dr. Dohn, and at the same time finding Plaintiff not disabled.[11]

Plaintiff notes that the definition of the word "moderate" *on the questionnaire* completed by Dr. Dohn is:

> Due to limitation(s), patient is only able to sustain ability for 1/3 to 2/3 of an 8 hour work day. (Ability to function in this area is seriously limited and less than satisfactory, but not precluded in all circumstances; cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting.)

(tr. 410). And the VE testified in response to a hypothetical question posed by Plaintiff's counsel that a person who is moderately limited *according to this definition* (in the three functional areas identified above) would be unable to work (*see* tr. 100). Thus, says Plaintiff, if the ALJ in fact adopted the limitations set forth by Dr. Dohn on the questionnaire, as the ALJ said he did, Plaintiff could not work.

Plaintiff's argument would be persuasive if read in a vacuum, but when the argument is considered alongside the ALJ's opinion and the record as a whole it is evident that any error—e.g., the ALJ's failure to recognize (or reconcile) that the

---

[11] Plaintiff does not contest the ALJ's discounting of Dr. Dohn's opinion that she would miss more than three days of work per month; she merely points out that Dr. Danahy reached the same conclusion (*see* ECF No. 12 at 23). As such, the undersigned will not address this finding further.

definition of "moderate" on the questionnaire did not comport with the definition of "moderate" found in the Regulations—is harmless.[12]

Before the ALJ addressed Dr. Dohn's questionnaire of January 2017 in his opinion, he extensively discussed Dr. Dohn's treatment records and examination findings in concluding that Plaintiff's mental impairments—while severe—did not meet the criteria of the relevant listings because they caused no more than *moderate* functional limitations (*see* tr. 18–20). More particularly, the ALJ noted that in order for Plaintiff's mental impairments to satisfy the "paragraph B" criteria of the listings, he would have to rate at least one area of functional limitation as "extreme" or rate two areas as "marked," *and* the ALJ referenced the ratings' definitions *as set forth in the regulations* (tr. 18; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00F.2. (listing and defining "none," "mild," "moderate," "marked," and "extreme")). The ALJ then found that Plaintiff had only "*moderate*" limitations—i.e., "functioning in th[ese] area[s] independently, appropriately, effectively, and on a sustained basis is fair" (20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00F.2.)—in the four areas of "understanding, remembering, or applying information"; interacting with others; "concentrating, persisting, or maintaining pace"; and "adapting or managing oneself"

---

[12] The hypothetical question posed by Plaintiff's counsel was long and compound, and counsel did not refer the VE to an exhibit number or otherwise indicate that the factual basis for her question was derived from the questionnaire (*see* tr. 100).

(tr. 18–19). In so finding, the ALJ specifically referenced the opinions, treatment records, or findings of Dr. Dohn as to *each* finding (tr. 18–19).[13] It is therefore evident that the ALJ found Plaintiff to have moderate functional limitations, *as defined by the Regulations* and not as defined by the questionnaire, and that he made these findings based on the record as a whole, including Dr. Dohn's treatment records (*id.*). The critical question for this court is whether the ALJ's findings of "moderate" limitations are substantially supported by the record. The court finds that they are, for the many reasons articulated by the ALJ. Accordingly, any error in failing to recognize that the questionnaire provided to Dr. Dohn defined "moderate" limitations differently is harmless, and, similarly, that any error in failing to fully credit those limitations as defined by the questionnaire is harmless.[14]

(2)     Susan Danahy, Ph.D., One-Time Consultative Examiner

Dr. Danahy examined Plaintiff on July 25, 2011, about seven months after the date Plaintiff alleges she became disabled. The ALJ summarized Dr. Danahy's findings and then assigned "little weight" to her GAF assessment of 48 (tr. 22).

---

[13] The ALJ also pointed to Dr. Danahy's observations, the non-examining agency consultants' opinions, Plaintiff's daily activities, and treatment notes from First Physicians in support of these findings (tr. 18–20).

[14] Also, although not specifically noted by the ALJ, Dr. Dohn indicated the limitations existed since June 2015 (tr. 411), after Plaintiff's date last insured. Thus, even if fully credited, the serious limitations reflected in the questionnaire would not be dispositive.

Plaintiff asserts error in this regard (ECF No. 12 at 20), but the court finds no error.

The ALJ found a GAF score of 48, which indicates "serious" symptoms, to be largely inconsistent with Dr. Danahy's own findings, with Plaintiff's "reported wide range of activities of daily living," with the treatment records from First Physicians and other providers, and with Plaintiff's lack of prior psychiatric care (tr. 22). All of these reasons are supported by the record and were properly considered. What is more, "the Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (quoting 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000)); *see also, e.g.*, Hernandez v. Comm'r of Soc. Sec., 644 F. App'x 468, 470 n.1 (6th Cir. 2016) (same, citing Wind, 133 F. App'x at 692 n.5). Accordingly, the court finds no error.

(3)    Janice T. Griffin, LCSW

Plaintiff attended six individual therapy sessions with Ms. Griffin, starting in or about October 2014, or nearly four years after the relevant period commenced. There are no treatment records from Ms. Griffin but only a letter from April 2015 noting the sessions and opining that Plaintiff "is likely unable to be successful in any occupational setting" (tr. 335). Ms. Griffin also completed questionnaires in July

2015 and July 2017, the latter of which is accompanied by a letter indicating that Plaintiff attended two additional counseling sessions in 2016 (*see* tr. 412), but again, no treatment records exist to document the 2016 sessions (which, in any event, occurred well after the relevant period ended). The opinions reflected on the questionnaires, if adopted as true, would render Plaintiff disabled.

The ALJ granted "little weight" to these opinions, in particular Ms. Griffin's opinions on the questionnaires regarding Plaintiff's "marked" functional limitations, finding that such limitations are not supported by Plaintiff's wide range of activities of daily living, the opinions and notations of Dr. Dohn, and the treatment records of Dr. Taylor and Dr. Mason (tr. 24). These findings of the ALJ are supported by the record. Of note, Plaintiff was the primary, full-time caregiver for her parents, and her daily activities included "24/7" care for both parents initially and thereafter for her mother after her father passed away and until her mother moved into an assisted care facility. She also served as her mother's guardian. Such activities are indeed inconsistent with disabling mental limitations.

The ALJ also noted that no treatment records existed to corroborate Ms. Griffin's opinions (tr. 24). To be sure, preprinted forms, such as those completed by Ms. Griffin, do not constitute persuasive evidence of the validity of the opinions expressed therein. *See, e.g.*, Hammersley v. Astrue, No. 5:08cv245–Oc–10GRJ, 2009

WL 3053707, at *6 (M.D. Fla. Sept.18, 2009) ("check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions") (citing Spencer ex rel. Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985) (rejecting opinion from a non-examining physician who merely checked boxes on a form without providing any explanation for his conclusions); Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) (noting that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best")). Stated another way, opinions on such forms are merely conclusory, and it is entirely proper for an ALJ to reject even a treating physician's opinion on such a basis, just as it would be as to any opinion on an ultimate issue reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); *see also, e.g.*, Edwards v. Comm'r of Soc. Sec., 636 F. App'x 645, 649 (6th Cir. 2016) ("the regulations make clear that no special significance is to be given to the source of an opinion on issues that are reserved to the Commissioner—including statements that a claimant is 'disabled' or 'unable to work'").

For these reasons, the court finds no error with regard to the ALJ's consideration of the opinions of LCSW Griffin.

(4)     John F. Duffy, Ph.D., and Lawrence Annis, Ph.D.,
        Non-Examining Agency Psychologists

The ALJ gave "great weight" to the opinions of Dr. Duffy and Dr. Annis, and Plaintiff contends the ALJ erred in doing so for a number of reasons, including that their opinions conflicted with those of Dr. Danahy. Plaintiff also suggests that Dr. Danahy's opinions are more in line with those of the doctors at First Physicians, so her opinions should not have been discounted or given less weight than those of Dr. Duffy and Dr. Annis. Again, the court finds no error.

First, as discussed above, the ALJ did not wholly reject Dr. Danahy's opinions (*see* tr. 22). Instead, he specifically found that Dr. Danahy's *GAF score* of 48 was inconsistent with other evidence of record; thus, he properly rejected the score (*id.*). Second, the court—like the ALJ—finds that the records from First Physicians are consistent with the opinions of Dr. Duffy and Dr. Annis (i.e., moderate functional limitations), as are the treatment records of Dr. Dohn. For example, the First Physicians' records generally show that although Plaintiff was anxious, her mental conditions could be controlled with medications (*see, e.g.*, tr. 316) and that her mental status examinations were largely unremarkable (*see, e.g.*, tr. 316, 318, 328, 378). Moreover, Dr. Dohn's PHQ-9 scores revealed only minimal or, at most, mild levels of impairment (*see, e.g.*, tr. 398). In addition, Plaintiff's own description of her psychological well-being revealed almost no abnormalities (*see* tr. 352–56), as did the

MMSE administered by Dr. Dohn (tr. 351).

Finally, "[s]tate agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6P, 1996 WL 374180, at *2 (July 2, 1996). "Findings of fact made by State agency medical . . . consultants and other program physicians . . . regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative review." *Id*. at *1. Nonetheless, "the opinions of State agency medical . . . consultants and other program physicians . . . can be given weight only insofar as they are supported by evidence in the case record . . . ." *Id*. at *2. As set forth above, the opinions of the non-examining experts in this case are consistent with each other and with the record as a whole. The ALJ therefore did not err in assigning great weight to the opinions of Dr. Duffy and Dr. Annis.

B.     Opinions of Attorney Edmund Holt

Plaintiff contends the ALJ "erred by failing to give significant weight to the testimony of Edmond Holt, guardianship attorney for plaintiff's parents and plaintiff" (ECF No. 12 at 16).

While noting the ambiguous nature of the Commissioner's regulations

regarding the consideration of lay testimony, the Eleventh Circuit has explained that "ALJs should consider all available evidence, including nonmedical evidence, such as information from parents and teachers." Shinn ex rel. Shinn v. Comm'r of Social Sec., 391 F.3d 1276, 1283–85 (11th Cir. 2004) (citations omitted). ALJs must also "state specifically the weight accorded each item of evidence and the reasons for [their] decision[s]." Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986). "The testimony of family members [and others] is evidence of a claimant's subjective feelings of pain [or other symptoms]." Osborn v. Barnhart, 194 F. App'x 654, 666 (11th Cir. 2006) (citing Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983)). But even if the ALJ fails to make an explicit credibility determination as to the testimony of a family member or lay person, there is no error if the credibility determination is implicit in the rejection of the claimant's testimony. Tieniber, 720 F.2d at 1254–55 (citing Allen v. Schweiker, 642 F.2d 799 (5th Cir. 1981)).

Here, the ALJ specifically addressed Mr. Holt's testimony and third-party questionnaires (tr. 21–22). He then assigned only "partial weight" to his statements regarding the "frequency, severity, and extent of [Plaintiff's] symptoms and resulting limitations" because those statements "were not supported by the overall, objective record" (tr. 22). The ALJ primarily focused on the inconsistencies between Attorney Holt's testimony/statements and the actions he took in relation to Plaintiff becoming

the guardian over her mother (*id.*). Put simply, the ALJ found that "Mr. Holt's agreement to allow the claimant to be guardian over his client was not consistent with his opinion that she was mentally incapable of all work" (*id.*).

In contending the ALJ erred, Plaintiff appears to make much of the fact that she was appointed guardian of her parent's property only, "whereas another person was appointed professional guardian of the person (her mother)" (*see* ECF No. 12 at 7), but this does not undermine the ALJ's reasoning. The fact remains that Attorney Holt facilitated Plaintiff becoming *a* guardian, which is not an appropriate role for a person who is mentally incapable of even unskilled work, especially considering Holt's acknowledgment that certified professional guardians were available as options in the community where Plaintiff and her mother resided. Moreover, regardless of whether Plaintiff's legal title was that of a guardian over person or property, her own testimony revealed that in actuality she shouldered tremendous responsibility for her parents' well-being during the relevant period, including caring for them on a full-time basis and managing their finances and medications, as did Holt's testimony, in particular when he characterized Plaintiff's care for them as "24/7." These activities are inconsistent with disabling mental limitations, as the ALJ found.

The ALJ also noted, correctly, that in Mr. Holt's Third Party Function Report, Supplemental Third-Party Anxiety Questionnaire, and Activities of Daily Living

forms, he indicated that he did not know information for many categories (tr. 22 (citing tr. 223–30, 234–35, 264–66)).

Finally, the same reasons the ALJ cited for discrediting Plaintiff's allegations of disabling symptoms and limitations, justify discrediting the disabling limitations assessed by Mr. Holt, as the ALJ indicated (*see* tr. 22).

VI.   CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560.  Furthermore, Plaintiff failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is hereby **ORDERED** that:

1.   The clerk of court is directed to substitute Andrew Saul for Nancy A. Berryhill as Defendant.

2.   The decision of the Commissioner is **AFFIRMED**, and this action is **DISMISSED**.

3.   **JUDGMENT** is entered, pursuant to sentence four of 42 U.S.C. § 405(g), **AFFIRMING** the decision of the Commissioner.

4.   The Clerk is directed to close the file.

At Pensacola, Florida this 25th day of September 2019.


/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**